UNITED STATES FEDERAL COURT
SOUTHERN DISTRICT OF NEW YORK

GERALDINE MONSON, as administratrix of the
Estate of James Pallonetti, deceased,

                      Plaintiff           23-cv-2965

       v.                        **COMPLAINT**

ROBERT BENTIVEGNA, MANDI        **(Related: 79-cv-5077(LAP))**
ZACCAGNINO, MARY ASHONG, LESTER
SILVER, JEANNLIS SANCHEZ, and EDWARD
UZU
                    Defendants.

**PRELIMINARY STATEMENT**

This is a civil rights suit alleging violation of the Eighth Amendment's guarantee of prisoners' freedom from cruel and inhumane treatment. Mr. James Pallonetti was in the care and custody of the State of New York Department of Corrections and Community Supervision ("DOCCS"). He was only sixty-two years old when he passed away. Medical defendants, all employees of the State of New York, denied him adequate medical care, timely diagnosis of his condition, proper pain management, palliative care, and treatment that may have prolonged his life. Geraldine Monson, as Administratrix of the Estate of James Pallonetti, complains against Defendants as follows:

**JURISDICTION AND VENUE**

1.     The Court has jurisdiction over the action pursuant to 28 U.S.C. § 1331.

2.     The Southern District of New York is an appropriate venue under 28 U.S.C. § 1391(b)(2) as the situs of the events giving rise to the claims herein.

**JURY DEMAND**

3. Plaintiff demands trial by jury in this action.

**PARTIES and STATE ACTORS**

4. **Decedent James Pallonetti** ("Decedent" or "Mr. Pallonetti") died on April 24, 2022 at Fishkill Regional Medical Unit, located in Dutchess County, New York. At all relevant times prior to Mr. Pallonetti's death, he was under the care and custody of DOCCS. Immediately preceding his death, Mr. Pallonetti was housed at Green Haven Correctional Facility ("Green Haven") located in Stormville, New York where the incidents described below took place.

5. **Ms. Geraldine Monson** ("Plaintiff" or "Ms. Monson") is the surviving spouse of Mr. Pallonetti. On December 21, 2022, Ms. Monson was duly appointed administratrix of the Estate of James Pallonetti by the Honorable Michael G. Hayes of the Dutchess County New York Surrogate's Court. Ms. Monson brings this suit as an heir and in her capacity as the Administratrix of the Estate of James Pallonetti.

6. **DOCCS** is an agency of the State of New York.

7. **Mandi Zaccagnino** ("Zaccagnino") is a Nurse Practitioner who worked at Green Haven and an employee of DOCCS.

8. **Dr. Robert Bentivegna** ("Bentivegna") serves as the Facility Health Services Director ("FHSD") at Green Haven as the chief administrator of the medical department. Bentivegna is an employee of DOCCS and has worked at Green Haven in the capacity of physician since 2007.

9. In Dr. Bentivegna's role as FHSD he is charged with overseeing the care provided by medical providers and answering correspondence from patients, family members and advocates

regarding the medical care afforded patients in his care, as well as other administrative duties.  Dr. Bentivegna also sometimes attends to patients.

10.     **Mary Ashong** ("Ashong") is a nurse practitioner at Green Haven and an employee of DOCCS.

11.     **Dr. Lester Silver** ("Silver") is a physician who worked at Green Haven for DOCCS.

12.     **Dr. Jeannlis Sanchez** ("Dr. Sanchez") is a physician who worked at Green Haven for DOCCS.

13.     **Dr. Edwin Uzu** ("Dr. Uzu") is a radiologist who worked at Green Haven as a physician for DOCCS.

## FACTUAL ALLEGATIONS

14.     In 2006 Decedent came under the care and custody of DOCCS.

15.     When Mr. Pallonetti entered DOCCS' custody he was already in bad health and forty-seven years old.  Mr. Pallonetti suffered from hypertension, complicated Hepatitis C disease with cirrhosis, fibropleural thickening at both lung bases, morbid obesity, chronic pancreatitis, and partial deafness.  In the first few years of his incarceration, Pallonetti began to suffer from varicose veins that impeded his ambulation and started to walk with a cane; he also started having trouble with urination and suffering from severe asthma and chronic pain.  As early as 2009, Mr. Pallonetti signed a DNR.  In 2009, Mr. Pallonetti was added as a chronic care patient for his hypertension.

16.     In 2010, Mr. Pallonetti was diagnosed with chronic acalculous cholecystitis and was labeled as having "terminal liver disease."  To control his pain, Dr. Braselmann at Elmira Correctional Facility prescribed him Percocet.

17. DOCCS housed Mr. Pallonetti in several different facilities. Throughout his incarceration the decedent was hospitalized on numerous occasions and experienced many emergency sick calls due to trouble breathing. All of these events were noted in Mr. Pallonetti's medical records.

18. In 2018 the Superintendent of Elmira submitted his name for executive clemency due to his medical issues and exemplary record. Forty-six members of DOCCS' staff at Elmira signed their name to an executive clemency petition, stating in part, "We know that Mr. Pallonetti is in poor health, and we feel that if Mr. Pallonetti is granted parole, he will live out his remaining years in peace and obscurity."

19. On or around January 21, 2021 DOCCS transferred Mr. Pallonetti to Green Haven from Fishkill. Medical staff at Fishkill told Mr. Pallonetti that he was being transferred to Green Haven so he could receive more and better medical care. Fishkill's outgoing instructions noted that Mr. Pallonetti could not work or participate in recreation and must be housed on the first "flats" level.

20. Defendant Bentivegna has served as the FHSD of Green Haven since at least 2018.

21. Defendant Bentivegna was aware that the facility was woefully understaffed with medical personnel to serve the almost 2,000 patients housed at Green Haven.

22. Green Haven required a medical staff of 7.5 full time doctors, 2 nurse practitioners and one physician's assistant, but the facility has had only on average 3.5 doctors and one nurse practitioner and one physician's assistant on staff. The facility also required twenty-seven (27) nurses, yet only had fourteen (14) on staff and attempted to fill the nursing shortages with contract service providers.

23. Dr. Bentivegna, himself, counted as one of the physicians on duty, yet he did not serve a caseload of patients and only periodically saw a patient, so, in truth, Green Haven only maintained a staff of 2.5 doctors during most of the relevant time period.

24. These serious staffing deficiencies caused extraordinary delays in getting a patient to see his provider and getting patients referred to specialists. Patients often waited days to be seen at "sick call" where a nurse would conduct a perfunctory examination and then the patient would wait several weeks if not months to see a primary care provider.

25. The Green Haven medical department was run in a way that mandated a patient would generally first be seen by a "sick call" nurse, who was supposed to triage the patient and ascertain his need to see a provider and how fast he should be seen.

26. However, nurses were not trained to triage complicated medical issues nor to do much more than dispense Ibuprofen or Tylenol and send patients back to their cells. In fact, many days licensed practical nurses, who are tasked with changing bed pans and taking temperatures in regular medical environments, were running sick call, instead of licensed registered nurses trained in triage and assessment.

27. Even registered nurses cannot adjust prescriptions nor do much other than take vitals and determine whether or not a patient can see a physician.

28. On many occasions, nurses turn away patients from sick call with critical and life-threatening issues like chest pain, unacceptably elevated blood pressure, neurological symptoms, and elevated blood sugar due to indifference, lack of training, and staffing shortages. In a normal medical environment, such notable symptoms would not be dismissed, nor would patients be returned to their cells with nothing more than ibuprofen.

29. There is also a medical culture at Green Haven in which medical staff disbelieve and diminish the medical issues of patients. Providers label patients as "malingering" or "seeking secondary gain" or label bona fide patient symptoms as "psychogenic" or "psychological." These trained and cultural biases result in patient suffering and, sometimes, death.

30. Green Haven has even perpetuated a culture where patients are threatened with disciplinary sanctions for seeking medical treatment through sick call – thereby discouraging ill patients from seeking medical treatment.

31. Other serious deficiencies impact the delivery of health care, including the failure of medical providers to review the policies, treatment guidelines and procedures relevant to the delivery of health care within DOCCS.

32. Providers also fail to review diagnostic results in a timely manner and fail to follow the recommendations of outside specialists, again, resulting in patient suffering and, sometimes, death.

33. Between 2018 and 2019, patients at Green Haven filed more than 738 grievances regarding deficiencies in medical care, including unacceptable delays in sending patients to see providers, unacceptable delays for diagnostic testing and the dismissiveness of medical staff toward serious, chronic complaints.

34. In 2018 alone, Defendant Bentivegna received 656 complaint letters – separate and apart from grievances -- from patients at Green Haven regarding inadequate medical care. He received 505 in 2019.

35. The number and contents of grievances and complaints are supposed to be discussed in quality assurance meetings and executive team meetings, yet, both the number and

contents of the grievances and complaints are ignored. No follow-through or self-critical analysis takes place to improve patient care.

36. Despite these repeated and voluminous grievances and complaints, Defendant Bentivegna took no steps to improve the delivery of health care at Green Haven.

37. Mr. Pallonetti's indraft medical evaluation was conducted on or around January 12, 2021. The medical evaluation was perfunctory. The medical records do not reflect that a physical was conducted but demonstrate that Mr. Pallonetti's blood pressure was 206/98.

38. Dr. Sanchez saw Mr. Pallonetti on January 21, 2021 and asked for an xray to ascertain the source of his back pain. She ordered physical therapy and an EMG but noted the appointments would take place only once COVID 19 restrictions were lifted. Sometime later she met with Mr. Pallonetti for his indraft. She noted his varicose veins, Hep C, COPD, liver cirrhosis, labored breathing, high blood pressure, and the significant amount of medications he had to take daily.

39. On January 25, 2021, Dr. Uzu read Mr. Pallonetti's Xrays and noted he suffered from muscle spasms in his back, fecal impaction, and vascular calcification.

40. Dr. Uzu and Dr. Sanchez did nothing to alleviate Mr. Pallonetti's serious and painful muscle spasms.

41. On February 4, 2021, Mr. Pallonetti was seen by physical therapist, Ali Ece, who clearly stated in his notes, "P[atient] would benefit from wheelchair for long distances."

42. On March 21, 2021, a Sunday, Mr. Pallonetti suffered an emergency sick call during which he could not breath. He asked to go to the hospital and was denied by medical staff. Mr. Pallonetti threatened to kill himself if he did not receive medical treatment – a threat that prisoners often have to launch in order to be seen by medical providers in the prison environment.

43. Mr. Pallonetti felt he was not getting the medical care he required – in fact, the care at Green Haven was significantly worse than care he had received at other facilities. Mr. Pallonetti's medical needs were ignored and on March 22, 2021 he was having difficulty walking and suffering from other medical issues. He was put on suicide watch in the facility infirmary.

44. On March 23, 2021, Nurse Practitioner Kathryn Infantino, who was in charge of the unit where Mr. Pallonetti was placed on suicide watch, finally sent Mr. Pallonetti to the hospital. Mr. Pallonetti had been weak, dizzy and in pain for 2 weeks. Additionally, he had been constipated for four days, was nauseous, diaphoretic, etc. Putnam Hospital admitted him to treat a small bowel obstruction.

45. Mr. Pallonetti returned to Green Haven on March 25 and was kept in the infirmary for a day before being returned to his cell.

46. On March 26, 2021, Mr. Pallonetti fell while trying to ambulate.

47. On March 28, 2021, Mr. Pallonetti called an emergency sick call because he could not walk and was, once again, constipated. His blood pressure was 200/100. He was admitted to the infirmary again and was released back to his cell on March 30, 2021 by Defendant Bentivegna. There is no record that Dr. Bentivegna examined Mr. Pallonetti before releasing him from the infirmary.

48. On or about April 1, 2021, Mr. Pallonetti was moved from H Block to E Block which was closer to the infirmary. He started 'borrowing' wheelchairs when he could because Defendants refused to give him a wheelchair permit.

49. On April 5, 2021, Mr. Pallonetti went to the clinic and saw Mary Ashong due to more abdominal pain. Mary Ashong did nothing for Mr. Pallonetti despite her access to his medical file and his apparent distress and declining health.

50. At this point, Prisoners Legal Services started to advocate on behalf of Mr. Pallonetti to get him the medical help he needed.

51. On April 13, 2021, Mr. Pallonetti was given a 'rolling walker' at the behest of the physical therapist. However, Mr. Pallonetti needed a wheelchair and was losing his ability to ambulate with the rolling walker. On April 19, 2021, he let medical know that he could not get to the medication window for his medications because he could not ambulate there.

52. On April 20, 2021, Nurse Practitioner Zaccagnino saw Mr. Pallonetti. She noted his blood pressure was 260/118, he suffered from bilateral weakness which was "worsening," and he was having a hard time getting to medications in the morning. Mr. Pallonetti asked her for a wheelchair and to have his medications "self carry" so he could take them when he could not get to the medication window.

53. While Zaccagnino attempted to switch the medications to self-carry, the request was denied despite the fact that Mr. Pallonetti could not get to the medication window. Defendant Zaccagnino did not appeal to anyone to reverse the decision so Mr. Pallonetti could take his medication, nor did she permit him to use a wheelchair to ensure his access to the medication window.

54. On April 21, 2021, Zaccagnino recorded that Mr. Pallonetti's blood pressure was 240/100.

55. On April 24, 2021, Mr. Pallonetti's blood pressure reading was 215/90. Nothing was done to switch his medication or get him more help. On April 25, 2021, there was a "lock down" and nursing staff had to deliver all medications to patients in their cells. Mr. Pallonetti's blood pressure was 133/85 because he was able to take his medications during this time period.

After the lock down, Mr. Pallonetti's blood pressure was recorded as 210/95. These facts were recorded in his AHR and all Defendants reviewed them.

56. On May 19, 2021, Mr. Pallonetti once again reported to Ms. Zaccagnino that he could not get to his medications. His blood pressure was 200/90. Instead of having Mr. Pallonetti transferred to a Regional Medical Unit or making other accommodations so he could get his medications, Zaccagnino labeled him as "non-compliant."

57. Green Haven also had a "Unit for the Physically Disabled" ("UPD") which has 44 cells for the accommodation of patients who required wheelchairs and heightened medical care. The UPD patients had "pushers" to push patients in their wheelchairs to medication administration. Despite the availability of these accommodations, Defendants did not move Mr. Pallonetti to the UPD to ensure access to his medications.

58. On May 28, 2021, Mr. Pallonetti was found in the building 2 corridor on top of his collapsed walker. He had fallen trying to ambulate.

59. On June 4, 2021, Mr. Pallonetti complained that he had been suffering from dizziness for more than 3 months. He reported no strength in his legs and that he had passed out in his cell. He was also vomiting. The nurse recorded that Mr. Pallonetti stated, "Something is very wrong help me." His blood pressure was 200/100. The nurse sent him to the clinic to be seen by Defendant Zaccagnino. Instead of helping Mr. Pallonetti, Zaccagnino noted "always makes it to medical for clinic appointments. Inmate also seen walking from commissary on 6/2/21 by me with no issues ambulating with walker." Zaccagnino failed to note the numerous falls already recorded in Mr. Pallonetti's medical records.

60. On or about June 7, 2021, Mr. Pallonetti had difficulty breathing and was given a nebulizer treatment by Dr. Uzu.

61. On June 21, 2021 Mr. Pallonetti was finally seen by neurologist Kishore Ranade who ordered an urgent MRI.

62. The urgent status was refused and the referral was changed to "soon" ensuring Mr. Pallonetti would not receive an urgent MRI. When the quality assurance company asked that the referral be faxed to them, no one at Green Haven bothered to fax it. Neither Defendant Zaccagnino nor Defendant Bentivegna challenged the change in urgency even while knowing it would mean delayed diagnostic testing, potential diagnosis, and care.

63. Mr. Pallonetti refused an appointment with cardiology on June 24, 2021 because he was too sick and weak to travel to the Fishkill RMU.

64. Throughout 2021, Dr. Patrick Marzano, a life-long friend of Mr. Pallonetti and a physician with over 30 years of experience, contacted Green Haven medical staff and spoke with Dr. Bentivegna on multiple occasions to discuss Mr. Pallonetti's medical care. Dr. Marzano repeatedly relayed that Mr. Pallonetti's high blood pressure readings needed to be stabilized and that he needed accommodations to ambulate to his medications. On at least one occasion, Dr. Bentivegna hung up on Dr. Marzano.

65. Mr. Pallonetti attempted to undergo the MRI on July 8, 2021. The technician could not access his vein to facilitate the contrast. The MRI that could be completed showed spondylosis, fluid in his L5-S1 articulations, disc protrusions in his C, L and T spines, and disc bulging.

66. In July of 2021, Mr. Pallonetti again reported thoughts of suicide due to his inability to get adequate medical care. He was able to see cardiology in late June. The cardiologist made pharmaceutical recommendations to try and control his hypertension, but also noted, "needs wheelchair," in underlined notes. Green Haven Defendants ignored the cardiologist's recommendation despite reviewing the consult notes.

67. On July 22, 2021, Mr. Pallonetti fell again.

68. In July of 2021, new class counsel appeared in the decades old *Milburn* class action case which challenged the unconstitutional delivery of medical care at Green Haven. *Milburn* class counsel represents all patients in custody at Green Haven who require constitutionally adequate medical care. *Milburn* counsel quickly came to know of Mr. Pallonetti's plight and submitted Mr. Pallonetti's medical records to the correctional health care experts on both sides of the case.

69. On August 5, 2021, Mr. Pallonetti was sent to Montefiore Mount Vernon Hospital for chest pain. The hospital noted he had been suffering from chest pain for three weeks and that he had trouble with ambulation. He was discharged eight days later after Montefiore staff stabilized him with consistent medications. The hospital also added Gabapentin and low dose narcotics to help manage Mr. Pallonetti's chronic pain. Due to consistent treatment the hospital was able to get Mr. Pallonetti's blood pressure from 210/104 to 170/90s – a significant improvement.

70. Dr. Marzano was able to speak with the medical staff at Montefiore, who relayed that Mr. Pallonetti required consistent medication administration and advanced care.

71. Upon return to Green Haven, Mr. Pallonetti was kept in the infirmary for a few days and then returned to his cell. Defendants discontinued Mr. Pallonetti's medications without medical justification.

72. By August 28, 2021, Dr. Lester Silver was on call. A nurse contacted him because Pallonetti was incredibly dizzy and could not ambulate. Silver instructed medical staff to admit Mr. Pallonetti to the infirmary and a nurse noted, "consider RMU (Regional Medical Unit) placement per Dr. Silver." No RMU assessment was conducted.

73. On September 3, 2021 Mr. Pallonetti went to sick call and explained his severe pain, dizziness, leg weakness and stated "something is very[,] very wrong." A nurse dismissively wrote, "knowledge deficient."

74. On September 9, 2021, a medical response was called to Mr. Pallonetti's cell due to his dizziness. Dr. Silver was on call and again ordered Mr. Pallonetti admitted to the infirmary.

75. He remained there for several days and was discharged once again to his cell without an RMU assessment or a transfer for heightened care either of which Defendant Bentivegna could have arranged.

76. On September 24, 2021, Mr. Pallonetti was admitted to the infirmary again after yet another fall. On September 27, 2021, Mr. Pallonetti started complaining of urinary incontinence and an inability to handle his activities of daily living. He also requested pain management due to his severe pain. Defendants did nothing for Mr. Pallonetti.

77. On September 28, 2021, vascular doctor Sundaran Ravikumar saw Mr. Pallonetti and recommended to Green Haven medical staff: "needs spinal reconstruction."

78. On September 29, 2021, Mr. Pallonetti fell in his cell again.

79. On September 30, 2021, Mr. Pallonetti was in the infirmary trying to get medical help. Dr. Silver noted, "this is a recurring issue not a medical emergency," yet Silver did nothing to help him. Dr. Silver noted Mr. Pallonetti's blood pressure was 224/102. He sent Mr. Pallonetti back to his cell.

80. At 2:40pm Mr. Pallonetti tried to kill himself by lacerating his left wrist. Dr. Silver then sent Mr. Pallonetti to the hospital. Mr. Pallonetti told the ER doctors at Montefiore that he was in unrelenting pain. He stated, "I just want the pain to go away."

81. The next day Zaccagnino sent Mr. Pallonetti back to his cell. She did not see him again until October 13, 2021. Then, his blood pressure was 220/80. Zaccagnino detailed all the sources of Mr. Pallonetti's pain, including the MRI results, yet still did nothing to help him except prescribe a little Elavil.

82. On October 21, 2021, Mr. Pallonetti saw neurosurgeon Dr. Charles Garell, who ordered a CT myelogram and noted, "Please allow wheelchair." Green Haven Defendants ignored the recommendation of Dr. Garell.

83. The Green Haven Defendants continued to do nothing for Mr. Pallonetti and treated him as if he was exaggerating his symptoms.

84. On January 13, 2022, the *Milburn* counsel sent an advocacy letter to Dr. Bentivegna requesting that Mr. Pallonetti be moved to an RMU. The letter enclosed the expert reports of Dr. Homer Venters, the correctional health care expert for Plaintiffs, and Dr. David Thomas, the correctional health care expert for DOCCS, who both examined Mr. Pallonetti's records and opined he should be moved to an RMU.

85. Defendant Bentivegna responded to *Milburn* counsel, "with all due respect to Drs. Venters and Thomas," Mr. Pallonetti is under the care of a licensed medical practitioner. Despite reading the fulsome recommendations of two medical experts, Dr. Bentivegna refused to effectively treat Mr. Pallonetti or have him transferred to a facility that could do so.

86. *Milburn* counsel also tried to advocate through DOCCS' counsel. Again, the result was negative at the direction of Defendant Bentivegna. RMU placement was denied by Defendant Bentivegna.

87. In late February of 2022, Mr. Pallonetti filed a grievance against Defendant Bentivegna for failing to consider him or assess him for placement in an RMU.

88. Mr. Pallonetti's health continued to deteriorate and his symptoms grew worse. In early March he frequently asked for emergency sick call due to symptoms consistent with his former bowel obstruction.

89. Due to Defendants' inaction, in March of 2022, *Milburn* counsel arranged for another medical expert, Dr. David Nidorf. to travel to Green Haven to examine Mr. Pallonetti on March 21, 2022.

90. On March 17, 2022, Defendants sent Mr. Pallonetti out to Putnam Hospital a few days before Dr. Nidorf was scheduled to examine him at Green Haven.

91. Imaging at Putnam Hospital revealed multiple lesions on Mr. Pallonetti's liver and biliary system highly suggestive of cancer. He also had a large blood clot in his portal vein. Green Haven Defendants had been treating Mr. Pallonetti as if he suffered from constipation and nothing more while ignoring his complaints and the entreaties of others on his behalf.

92. On March 30, 2022, Mr. Pallonetti was transferred from the hospital to Fishkill RMU.

93. Mr. Pallonetti passed away on April 24, 2022, having suffered severely for over a year at the hands of Green Haven Defendants who either ignored or diminished the import of his complaints, denied him reasonable accommodations so he could access his medications, threatened him with discipline for complaining, and otherwise were deliberately indifferent to his serious medical needs.

**AS FOR THE FIRST CAUSE OF ACTION**
**42 U.S.C. 1983 –** *Deliberate Indifference to Medical Needs*
*(Against Defendants Bentivegna, Zaccagnino, Silver, Ashong and Uzu)*

94. Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

95. Mr. Pallonetti was in the care and custody of NYS DOCCS. His assigned provider was Defendant Zaccagnino, though he was also treated by Defendants Ashong, Silver and Bentivegna.

96. Mr. Pallonetti had no ability to arrange for his own medical providers, send for an ambulance, arrange specialty appointments, or gain second opinions without the direct involvement of NYS DOCCS medical employees.

97. In fact, Mr. Pallonetti could not get to see his own provider at DOCCS without going through a nurse at sick call who, more often than not, discounted his symptoms and complaints.

98. From early 2021 to his death Mr. Pallonetti repeatedly complained, in writing and verbally, of ever-increasing pain and symptoms, including pain in his back, abdomen and legs, shortness of breath, uncontrolled hypertension, vomiting, and an inability to ambulate to Defendants.

99. Defendants ignored or disregarded Mr. Pallonetti's serious symptoms that were growing increasingly obvious and concerning; some medical personnel even noted that he was suffering from "altered comfort."

100. When Mr. Pallonetti was treated at a hospital, hospital personnel administered pain management treatment, in the form of Gabapentin and low dose narcotics to manage his pain.

101. These medications were then discontinued by Defendants without medical justification.

102. Defendants did not send Mr. Pallonetti out for an appropriate assessment until just days before a medical expert was scheduled to come into Green Haven to examine him.

103. Only at that time was it discovered that Mr. Pallonetti was suffering from cancer.

104. The effects of Mr. Pallonetti's undiagnosed and untreated disease were serious and painful.

105. Mr. Pallonetti died less than 30 days after his diagnosis and was acutely aware that at that late stage nothing could be done to prolong or save his life.

106. Given his age at onset, had Mr. Pallonetti received timely diagnosis for his cancer and aggressive treatment, he may have survived, his life could have been prolonged, or he may have at least received palliative care to diminish his suffering.

Dated: April 7, 2023
New York, New York

**LAW OFFICE OF AMY JANE AGNEW, P.C.**

By: */s/ AJ Agnew*
Amy Jane Agnew, Esq.
*Counsel for Plaintiff*
24 Fifth Avenue, Suite 1701
New York, New York 10011
(973) 600-1724
aj@ajagnew.com